Michael A. Sirignano (MS 5263)
Barry I. Levy (BL 2190)
Priscilla D. Kam (PK 1505)
Vincent J. Pontrello (VP 0848)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees*
*Insurance Company, GEICO Indemnity Company,*
*GEICO General Insurance Company and*
*GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and
GEICO CASUALTY COMPANY,                    Docket No.: _____(      )

                          Plaintiffs,

            -against-

EXPERT PHARMACY, INC., and
YAKOV SHALOMOV,

                          Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively, "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants, Expert Pharmacy, Inc., and Yakov

Shalomov (collectively, "Defendants"), hereby allege as follows:

1.      This action seeks to terminate a large, on-going fraudulent scheme perpetrated by

the Defendants who have exploited the New York "No-Fault" insurance system by submitting

more than $2.3 million in fraudulent pharmaceutical billing to GEICO. Specifically, the Defendants submitted, or caused to be submitted, thousands of fraudulent claims to GEICO seeking payment for a set of specifically targeted medically unnecessary "pain relieving" topical prescription drug products including topical pain gels, ointments and patches – primarily in the form of topical diclofenac sodium gels and solutions and topical lidocaine ointments and patches – (collectively, the "Fraudulent Topical Pain Products"), as well as certain other medications including oral nonsteroidal anti-inflammatories ("NSAIDs") and muscle relaxers (together with the Fraudulent Topical Pain Products, the "Fraudulent Pharmaceuticals").

2.       Defendants Expert Pharmacy, Inc. ("Expert") and its owner, Yakov Shalomov ("Shalomov"), dispensed the Fraudulent Pharmaceuticals to individuals involved in automobile accidents and eligible for insurance coverage under policies of insurance issued by GEICO (the "Insureds"). To exploit the Insureds for financial gain, the Defendants targeted the prescription and dispensing of the Fraudulent Topical Pain Products in place of other effective, but much-less costly prescription and non-prescription drug products because the Defendants were able to acquire the Fraudulent Topical Pain Products at low cost and then dispense and bill for them at exorbitant prices.

3.       In furtherance of the fraudulent scheme, the Defendants entered into illegal, collusive agreements with various prescribing healthcare providers (the "Prescribing Providers") and unlicensed laypersons (the "Clinic Controllers") who work at or are associated with various multidisciplinary medical clinics that almost exclusively treat No-Fault patients (the "No-Fault Clinics"). Pursuant to these collusive agreements, in exchange for kickbacks or other financial incentives, the Defendants steered the Prescribing Providers and Clinic Controllers to direct large volumes of prescriptions for the targeted Fraudulent Topical Pain Products to Expert.

4.      To effectuate the scheme and maximize profits, the Defendants intentionally targeted a handful of specific pain medications (i.e., the Fraudulent Topical Pain Products) to dispense to Insureds along with other pharmaceuticals based solely on the medications' exorbitant pricing and high profit margins. Then, in exchange for kickbacks or other incentives, the Defendants caused the Prescribing Providers and Clinic Controllers to steer prescriptions for the exorbitantly priced Fraudulent Topical Pain Products to Expert without any regard for genuine patient care.

5.      The Defendants' scheme to steer the Prescribing Providers and Clinic Controllers to routinely prescribe and direct prescriptions to Expert for large volumes of the Fraudulent Topical Pain Products pursuant to their collusive arrangements egregiously inflated the charges submitted to GEICO.  For example, Expert typically submitted claims to GEICO seeking (i) $944.00 for a single tube of Diclofenac Sodium Gel 3%; (ii) $1,1168.50 for a single tube of Diclofenac Sodium Solution 1.5%; (iii) $609.00 to $1,480.00 for a single tube of Lidocaine 5% Ointment; (iv) $246.60 to $739.80 for a single box of Lidocaine 5% Patches; and (v) $1,267.20 to $1,311.30 for a single box of Lidothol Patches.  The Defendants' scheme also posed serious risks to patients' health, safety, and well-being, as the Fraudulent Pharmaceuticals were prescribed and dispensed in predetermined fashion, without regard to genuine patient care, and without regard to proper documentation.

6.      By this action, GEICO seeks to recover more than $804,600.00 that the Defendants stole from it, along with a declaration that GEICO is not legally obligated to pay reimbursement to Expert of over $981,800.00 in pending fraudulent No-Fault claims that the Defendants submitted or caused to be submitted through Expert because:

(i)      Expert billed for pharmaceutical products that were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent

protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

(ii)     The Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Expert in exchange for unlawful kickbacks and other financial incentives;

(iii)    the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and had Expert dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals; and

(iv)     the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals under the name of Expert pursuant to illegal, invalid, and duplicitous prescriptions.

7.     The Defendants' scheme began in early 2020 and continues through the present day as the Defendants continue to submit fraudulent billing to GEICO and to seek collection on unpaid fraudulent billing.

8.     As discussed more fully below, the Defendants at all times have known that: (i) the Fraudulent Pharmaceuticals billed through Expert were medically unnecessary, and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which they steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Expert in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and had Expert dispense in large volumes to Insureds at exorbitant charges, in place of other effective, less costly pharmaceuticals; and (iv) the Defendants made and continue to make false

and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals pursuant to illegal, invalid, and duplicitous prescriptions.

9.      Based on the foregoing, Expert does not have – and never had – any right to be compensated for the Fraudulent Pharmaceuticals allegedly dispensed to GEICO Insureds.  The chart attached hereto as Exhibit "1" sets forth a sample of the fraudulent claims that have been identified to-date which the Defendants submitted, or caused to be submitted, to GEICO through the United States mail.  As a result of the Defendants' scheme, GEICO has incurred damages of approximately $804,600.00.

## THE PARTIES

### I.    Plaintiffs

10.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.   Defendants

11.     Defendant Expert is a New York corporation, formed on or about October 18, 2019, with its principal place of business at 107-02 Jamaica Avenue, Richmond Hill, New York.

12.     Expert commenced submitting claims for reimbursement to GEICO as early as January 2020, although it was not registered with the NYS Office of Professions until February 24, 2020.

13.     Defendant Shalomov resides in and is a citizen of New York. Shalomov is the record owner of Expert.

14.     Prior to Expert, there was another pharmacy located at 107-02 Jamaica Avenue, Richmond Hill known as DNA Pharmacy, Inc. ("DNA Pharmacy"). GEICO previously filed a complaint in the Eastern District of New York whereby it credibly alleged that DNA Pharmacy and another pharmacy – VIP Pharmacy Corp. ("VIP Pharmacy") -- were engaged in fraudulent billing and treatment protocols like those present here. See Government Employees Insurance Co et. al v. VIP Pharmacy Corp. et. el, 21-cv-01341 (BMC) (E.D.N.Y. 2021) (the "DNA litigation").

15.     Expert appears to be nothing more than a "morph" of DNA Pharmacy and an extension of the scheme described in the DNA litigation.

16.     Expert is located in the former storefront of DNA Pharmacy and used the same employees as DNA Pharmacy, including the same supervising pharmacist.  Expert also used the same collections attorneys, the same billing company, and the same delivery service as DNA Pharmacy, and maintained a bank account at the same branch of Ponce Bank in Forest Hills, Queens as DNA Pharmacy. Further, Expert dispensed pharmaceuticals, including refills for pharmaceuticals, to DNA Pharmacy's former patients and even submitted claims to GEICO using forms with DNA Pharmacy listed as the assignee of the patient.

17.     Expert also used the same phone and fax numbers and Pitney Bowes postal meter as both DNA Pharmacy and VIP Pharmacy – this is the same postal meter used by Sterling Drugstore, Inc. which was recently identified in an indictment regarding a multimillion-dollar pharmacy fraud scheme.  See United States of America v. Peter Khaim and Arkadiy Khaimov, 1:20-CR-00580.

18.     Expert registered with the NYS Office of Professions less than one month after DNA Pharmacy ceased billing GEICO.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

20.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331, over the claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States.

21.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

22.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.      An Overview of New York's No-Fault Laws

23.     GEICO underwrites automobile insurance in the State of New York.

24.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.)(collectively, referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to the Insureds.

25.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

26.    An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3").    Alternatively, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

27.    Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

28.    The implementing regulation adopted by the Superintendent of Insurance, 11 NYCRR § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis supplied).

29.    In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed providers may practice a profession in New York because of the concern that unlicensed persons are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

30.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    An Overview of Applicable Licensing Laws

31.     Pursuant to New York Education Law § 6808, no person, firm, corporation or association shall possess drugs, prescriptions or poisons for the purpose of compounding, dispensing, retailing, wholesaling or manufacturing, or shall offer drugs, prescriptions or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer or outsourcing facility.

32.     Pursuant to 8 N.Y.C.R.R. § 29.1 pharmacies in New York are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

33.     Similarly, 8 N.Y.C.R.R. § 29.1 prohibits pharmacies from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

34.     Pursuant to 8 N.Y.C.R.R. § 63.1(7) pharmacists or pharmacy interns shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to therapeutic duplication, drug-drug

interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

35.    New York Education Law § 6810 prohibits pharmacies from dispensing when a prescription form for a drug includes any other drug. Separate prescriptions are required for each drug prescribed and dispensed.

36.    New York Education Law § 6810 prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

37.    New York Education Law § 6530(17) prohibits a physician from "exercising undue influence" on the patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party.

38.    New York Education Law § 6530(18) prohibits a physician from "directly or indirectly" offering, giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

39.    New York Education Law § 6509-a, prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications.

40.    Pursuant to New York Education Law § 6808(2)(c), "[t]he names of the owner or owners of a pharmacy shall be conspicuously displayed upon the exterior of such establishment. The names so displayed shall be presumptive evidence of ownership of such pharmacy by such person or persons."

41.     Pursuant to New York Education Law § 6808(e), pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

42.     Pursuant to New York Education Law § 6808(e), pharmacy owners are responsible "for the strength, quality, purity and the labeling thereof of all drugs, toxic substances, devices and cosmetics, dispensed or sold, subject to the guaranty provisions of this article and the public health law."

43.     Pursuant to New York Education Law § 6808(h), "an application for registration as a pharmacy shall be over good moral character."

## III.     The Defendants' Scheme Involving The Fraudulent Pharmaceuticals

### A.     Overview of the Scheme

44.     Beginning in or about January 2020 and continuing uninterrupted through the present day, Defendant Shalomov masterminded and implemented a fraudulent scheme in which he used Expert to exploit patients for financial gain and bill the New York automobile insurance industry for millions of dollars in exorbitant charges relating to the Fraudulent Pharmaceuticals purportedly provided to Insureds.

45.     Shalomov is listed as the sole owner and operator of Expert.

46.     Shalomov did not own or operate any other pharmacy prior to becoming the sole owner and operator of Expert.

47.     Shalomov had no prior work experience with prescription drug products, prior to becoming the sole owner and operator of Expert.

48.     Shalamov nevertheless submitted billing for prescription drug products to GEICO through Expert, using the US Mail, that totaled more than $1,513,000.00 within the first year from when Expert began billing GEICO.

49.    Shalamov and Expert continued on billing GEICO by submitting a total of more than $2,333,000.00 in fraudulent pharmaceutical billing to GEICO before Expert abruptly ceased its billing in late 2021.

50.    Shalamov presented Expert as a storefront neighborhood pharmacy operating in Queens County, New York but instead operated it as part of a large-scale fraud scheme that exploited GEICO's Insureds, as well as insureds of other New York automobile insurers, through the prescribing and dispensing of the Fraudulent Pharmaceuticals.

51.    Unlike legitimate pharmacies dispensing a wide variety of pharmaceutical products, Expert's business was largely focused on a limited set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products).

52.    In fact, the Fraudulent Topical Pain Products accounted for more than 71% of the total claims for reimbursement that Defendants submitted to GEICO.

53.    The Defendants chose the Fraudulent Topical Pain Products because they knew that (i) similar over-the-counter drugs that could be recommended to Insureds are not covered expenses under the No-Fault Laws and (ii) they could acquire the Fraudulent Topical Pain Products at low cost and submit claims for reimbursement under the No-Fault Laws at exorbitant prices.

54.    In furtherance of the fraudulent scheme, the Defendants entered into illegal, collusive agreements with the Prescribing Providers and the Clinic Controllers where, in exchange for the payment of kickbacks, they steered the Prescribing Providers and the Clinic Controllers to prescribe large volumes of medically unnecessary Fraudulent Topical Pain Products to Insureds treating at various No-Fault Clinics and to direct those prescriptions to Expert.

55.    These No-Fault Clinics present themselves to be legitimate healthcare practices when, in fact, they are known No-Fault medical mills that house a "revolving door" of numerous

healthcare providers who subject Insureds to as many healthcare goods and services as possible in order to exploit the Insureds' No-Fault Benefits by submitting large volumes of fraudulent claims to No-Fault insurers such as GEICO.

56.    For example, GEICO has received billing for purported healthcare services rendered at 64 Nagle Avenue, New York, New York from a "revolving door" of over 50 purportedly different healthcare providers, which was a major source of prescriptions that Expert submitted to GEICO in support of its charges.

57.    Similarly, GEICO has received billing for purported healthcare services rendered at 107-04 Jamaica Avenue, Jamaica, New York from a "revolving door" of over 25 purportedly different healthcare providers, which was a major source of prescriptions that Expert submitted to GEICO in support of its charges.

58.    The Prescribing Providers and the No-Fault Clinics from where they operate have often been the subject of investigations and lawsuits with regard to their fraudulent billing and treatment practices, and have been the source of excessive, fraudulent treatment and billing schemes aimed at generating profits without regard to patient care.

59.    For example, Expert Pharmacy received prescriptions from Prescribing Providers associated with Rutland Medical P.C. and Dr. Marvin Moy ("Dr. Moy"), operating from 145 East 98th Street, Brooklyn, 71 South Central Avenue, Valley Stream, and 135-25 79th Street, Suite 2A, Howard Beach.  In a recently unsealed indictment, the record owner of Rutland Medical P.C., Dr. Moy, was indicted along with unlicensed layperson Bradley Pierre for their involvement in a scheme to bill for excessive and fraudulent medical treatments, including paying kickbacks to bring patients to medical clinics.  See United States of America v. Bradley Pierre, et al, 22-cr-019 (AT) (S.D.N.Y. 2022).

60.    As a further example, Expert Pharmacy received prescriptions from Prescribing Provider Laxmidhar Diwan, M.D. ("Dr. Diwan"), who has been named as a defendant in multiple No-fault fraud litigation cases based on allegations he issued duplicitous prescriptions for DME pursuant to fraudulent billing and treatment protocols, including allegations that the prescriptions were photocopied, altered, and then resubmitted in support of multiple claims. See, Government Employees Ins. Co. et al v. Reliable DPM Surgical Supply, Inc. et al, 1:20-cv-05475 (LDH)(JRC) (E.D.N.Y. 2020) and Government Employees Ins. Co. et al v. AZCare, Inc. et al, 1:20-cv-05312(PKC)(RML).

61.    In keeping with the fact that Defendants colluded with the Prescribing Providers and the Clinic Controllers to direct large volumes of prescriptions for the Fraudulent Topical Pain Products to Expert without regard to genuine patient care, at times the recommendation and treatment plans of the Prescribing Provider's examination reports were inconsistent with the medications prescribed and dispensed. For example:

    i.    Insured NR was allegedly involved in a motor vehicle accident on October 28, 2019. Thereafter, NR sought treatment with Rutland Medical, P.C. ("Rutland Medical") at a No-Fault Clinic located at 71 South Central Avenue, Valley Stream, New York, and underwent a follow-up examination with Natalie Feldman, N.P.C. ("NP Feldman") on June 16, 2020. NP Feldman did not document the prescription of any medication under the treatment plan section of the examination report, thereby indicating no medication was recommended or prescribed. Nevertheless, on June 23, 2020, Expert dispensed and billed for Lidocaine 5% Ointment and Diclofenac Sodium Gel 3% pursuant to a prescription allegedly issued by Marvin Moy, M.D. ("Dr. Moy") dated June 16, 2020.

    ii.    Insured JR was allegedly involved in a motor vehicle accident on May 16, 2020. Thereafter, JR sought treatment with Queens Arthroscopy & Sports Medicine, P.C. ("Queens A&S") at a No-Fault Clinic located at 62-54 97th Place, Suite 2, Rego Park, New York, and underwent an examination with Laxmidhar Diwan, M.D. ("Dr. Diwan") on September 18, 2020. Dr. Diwan did not document the prescription of any medication under the treatment plan section of the examination report, thereby indicating no medication was recommended or prescribed. Nevertheless, on September 22, 2020, Expert dispensed and billed

for Diclofenac Sodium Gel 3% pursuant to a prescription allegedly issued by Dr. Diwan dated September 18, 2020.

iii.    Insured NM was allegedly involved in a motor vehicle accident on August 17, 2020. Thereafter, NM sought treatment with Queens A&S at a No-Fault Clinic located at 62-54 97th Place, Suite 2, Rego Park, New York, and underwent an examination with Dr. Diwan on September 11, 2020. Dr. Diwan did not document the prescription of any medication under the treatment plan section of the examination report, thereby indicating no medication was recommended or prescribed. Nevertheless, on September 14, 2020, Expert dispensed and billed for Diclofenac Sodium Gel 3%, Tramadol, and Terocin 4% patches pursuant to a prescription allegedly issued by Dr. Diwan dated September 11, 2020.

iv.    Insured RA was allegedly involved in a motor vehicle accident on May 23, 2020. Thereafter, RA sought treatment with Rutland Medical at a No-Fault Clinic located at 71 South Central Avenue, Valley Stream, New York, and underwent an initial examination with NP Feldman on June 2, 2020. NP Feldman documented "oral analgesics and muscle relaxants" under the treatment plan section of the examination report. However, on June 7, 2020, Expert dispensed and billed for Lidocaine 5% Patches pursuant to a prescription allegedly issued by Dr. Moy dated June 2, 2020.

v.    Insured AM was allegedly involved in a motor vehicle accident on October 15, 2019. Thereafter, AM sought treatment with Rutland Medical at a No-Fault Clinic located at 135-25 79th Street, Suite 2A, Howard Beach, New York, and underwent a follow-up examination with NP Feldman on May 21, 2020. NP Feldman did not document the prescription of any medication under the treatment plan section of the examination report, thereby indicating no medication was recommended or prescribed. However, on May 31, 2020, Expert dispensed and billed for Lidocaine 5% Patches, Diclofenac Sodium Gel 3%, and Acetaminophen pursuant to prescriptions allegedly issued by Dr. Moy dated May 21, 2020.

vi.    Insured FG was allegedly involved in a motor vehicle accident on February 10, 2020. Thereafter, FG sought treatment with Rutland Medical at a No-Fault Clinic located at 71 South Central Avenue, Valley Stream, New York, and underwent an initial examination with NP Feldman on February 28, 2020. NP Feldman did not document the prescription of any medication under the treatment plan section of the examination report, thereby indicating no medication was recommended or prescribed. However, nearly two months later, on April 24, 2020, Expert dispensed and billed for Lidocaine 5% Patches and Cyclobenzaprine pursuant to prescriptions allegedly issued by NP Feldman dated February 28, 2020.

vii.   Insured LS was allegedly involved in a motor vehicle accident on December 4, 2019. Thereafter, LS sought treatment with Rutland Medical at a No-Fault Clinic located at 135-25 79th Street, Suite 2A, Howard Beach, New York, and underwent a follow-up examination with NP Feldman on July 6, 2020.  NP Feldman did not document the prescription of any medication under the treatment plan section of the examination report, thereby indicating no medication was recommended or prescribed. However, on July 7, 2020, Expert dispensed and billed for Lidocaine 5% Ointment, Meloxicam, and Cyclobenzaprine pursuant to prescriptions allegedly issued by Dr. Moy dated July 6, 2020.

viii.   Insured DC was allegedly involved in a motor vehicle accident on February 24, 2020. Thereafter, DC sought treatment with Rutland Medical at a No-Fault Clinic located at 71 South Central Avenue, Valley Stream, New York, and underwent a follow-up examination with NP Feldman on June 30, 2020.  NP Feldman did not document the prescription of any medication under the treatment plan section of the examination report, thereby indicating no medication was recommended or prescribed. However, on July 7, 2020, Expert dispensed and billed for a Lidocaine 5% patch, Meloxicam, and Cyclobenzaprine pursuant to prescriptions allegedly issued by Dr. Moy dated July 1, 2020.

ix.   Insured SO was allegedly involved in a motor vehicle accident on June 17, 2020. Thereafter, SO sought treatment with Rutland Medical at a No-Fault Clinic located at 135-25 79th Street, Suite 2A, Howard Beach, New York, and underwent an initial examination with NP Feldman on June 18, 2020.  NP Feldman documented "oral analgesics and muscle relaxants" and "see RX" under the treatment plan section of the examination report. Nevertheless, on June 25, 2020, Expert dispensed and billed for Lidocaine 5% Patches, Diclofenac Sodium Gel 3%, Naproxen, and Cyclobenzaprine pursuant to a prescription allegedly issued by Dr. Moy dated June 18, 2020.  Notably, the simultaneous prescription of a topical and an oral NSAID (i.e., Diclofenac Sodium Gel 3% and Naproxen) constitutes therapeutic duplication which increases the potential risks associated with these medications without providing any additional benefit to the patient.

x.   Insured KA was allegedly involved in a motor vehicle accident on June 14, 2020. Thereafter, KA sought treatment with Rutland Medical at a No-Fault Clinic located at 135-25 79th Street, Suite 2A, Howard Beach, New York, and underwent an initial examination with NP Feldman on June 22, 2020. NP Feldman documented "oral analgesics and muscle relaxants" and "see RX" under the treatment plan section of the examination report. Nevertheless, on June 25, 2020, Expert dispensed and billed for Lidocaine 5% Patches and Naproxen pursuant to a prescription allegedly issued by Dr. Moy dated June 22, 2020.

16

62.     Further, in keeping with the fact that the Defendants illegally steered the Prescribing Providers and the Clinic Controllers to provide Expert with prescriptions for the Fraudulent Pharmaceuticals pursuant to predetermined fraudulent protocols, Insureds were never given the option to use a pharmacy of their choosing.

63.     Instead, the Defendants colluded with the Prescribing Providers and Clinic Controllers to ensure that they directed the prescriptions for the Fraudulent Pharmaceuticals to Expert, regardless of the distance of this pharmacy from the Insureds or the No-Fault Clinics where they were treating.

64.     In fact, more than 60% of Insureds who received prescriptions dispensed by Expert resided outside of Queens County where Expert is located.  The prescriptions for these Insureds were directed to Expert even though (i) the No-Fault Clinics where they were treated and the patients themselves were located in counties far from Expert, and (ii) there were countless other pharmacies located much closer to the No-Fault Clinics and the patients.

65.     The Defendants spearheaded their pharmaceutical fraud scheme involving the Prescribing Providers and the Clinic Controllers knowing that (i) the Fraudulent Pharmaceuticals were not medically necessary, and were  prescribed and dispensed pursuant to predetermined protocols designed to exploit the patients for financial gain, without regard to genuine patient care; (ii) the Fraudulent Pharmaceuticals were the product of illegal, collusive arrangements intended to inflate the billing from Expert to insurers and financially enrich the Defendants; (iii) the Defendants intentionally targeted the specific Fraudulent Topical Pain Products which they acquired at low cost and dispensed in large volumes to Insureds at inflated charges; and (iv) the Fraudulent Pharmaceuticals were prescribed and dispensed without regard for the availability of a

wide range of other prescription and over-the-counter medications proven to have therapeutic effects and available at a fraction of the cost.

**B.**     **The Fraudulent Pharmaceuticals Were Prescribed and Dispensed Without Regard to Genuine Patient Care and to Exploit Patients for Financial Gain**

66.     In basic terms, the goal of medical treatment is to help patients get better in a timely manner. Notwithstanding this basic goal, Insureds treated by the Prescribing Providers at the No-Fault Clinics associated with the Clinic Controllers – and who received pharmaceuticals from Expert – were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' timely return to good health.

67.     Despite this basic goal, the treatment reports for the Insureds who received Fraudulent Pharmaceuticals from Expert almost uniformly reflected that the Insureds did not get better, did not return to good health, and did not experience improvement in their conditions such that the Insureds could terminate medical treatment expeditiously and return to normal activity.

68.     Rather, as part of the predetermined protocol, the Prescribing Providers produced generic, preprinted, boilerplate examination reports designed to justify continued, voluminous, and excessive healthcare services that healthcare providers at the No-Fault Clinics purported to render to the Insureds. These healthcare services included the prescription of excessive and medically unnecessary pharmaceutical drug products such as the Fraudulent Pharmaceuticals.

69.     Notwithstanding the creation of the examination reports, the Prescribing Providers' prescriptions for the Fraudulent Pharmaceuticals dispensed by Expert were based on predetermined protocols designed to exploit Insureds for financial gain, without regard to the genuine needs of the patients.

70.     To the extent any examination was performed at all, the Prescribing Providers regularly failed to document a detailed medical history of the patients to whom they prescribed the Fraudulent Pharmaceuticals.

71.     Prescribing a multitude of pharmaceutical drug products without first taking a detailed patient history demonstrates a gross indifference to patient health and safety, as the Prescribing Providers often did not know whether the patient was currently taking any medication or suffering from any comorbidity that would contraindicate the use of a particular prescribed drug.

72.     The Prescribing Providers also routinely failed to document in their examination reports whether the patients were intolerant of oral medications necessitating a prescription for a Fraudulent Topical Pain Product.

73.     The Prescribing Providers also routinely failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to a particular patient and dispensed by Expert were actually used by the patient.

74.     The Prescribing Providers also continuously failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to a particular patient and dispensed by Expert provided any pain relief to the patient or were otherwise effective for the purpose prescribed.

75.     In keeping with the fact that the Fraudulent Pharmaceuticals were not medically necessary and were prescribed and dispensed pursuant to fraudulent treatment protocols and collusive agreements, the Prescribing Providers treatment notes often contained vague and generic references to Fraudulent Pharmaceuticals to purportedly prescribe to Insureds. For example:

> i.     Insured KI was allegedly involved in a motor vehicle accident on November 4, 2019. Thereafter, KI sought treatment with Rutland Medical at a No-Fault Clinic located at 135-25 79th Street, Suite 2A, Howard Beach, New York, and underwent a follow-up examination with NP Feldman on June 8, 2020.

Feldman's treatment plan directed KI to take Tylenol and stated "see RX" but did not describe the specific type or dosage of any medications. Thereafter, on June 25, 2020, Expert dispensed and billed for Lidocaine 5% Patches and Ibuprofen pursuant to prescriptions allegedly issued by Dr. Moy dated June 8, 2020.

ii.     Insured JJ was allegedly involved in a motor vehicle accident on March 2, 2020. Thereafter, JJ sought treatment with Rutland Medical at a No-Fault Clinic located at 135-25 79th Street, Suite 2A, Howard Beach, New York, and underwent a follow-up examination with NP Feldman on June 22, 2020. NP Feldman's treatment plan stated "see RX" but did not describe the specific type or dosage of any medications. Thereafter, on June 26, 2020, Expert dispensed and billed for a Lidocaine 5% patch and Naproxen pursuant to prescriptions allegedly issued by Dr. Moy dated June 22, 2020.

iii.    Insured DF was allegedly involved in a motor vehicle accident on February 14, 2020. Thereafter, DF sought treatment with Rutland Medical at a No-Fault Clinic located at 145 East 98th Street, Brooklyn, New York, and underwent a follow-up examination with Shran Aldad, P.A. ("PA Aldad") on May 18, 2020. PA Aldad's treatment plan stated "see RX" but did not describe the specific type or dosage of any medications. Thereafter, on June 29, 2020, Expert dispensed and billed for Diclofenac Sodium Gel 3% and Cyclobenzaprine pursuant to prescriptions allegedly issued by PA Aldad dated June 1, 2020.

iv.     Insured VA was allegedly involved in a motor vehicle accident on May 21, 2020. Thereafter, VA sought treatment with Rutland Medical at a No-Fault Clinic located at 145 East 98th Street, Brooklyn, New York, and underwent an initial examination with NP Feldman on June 11, 2020. NP Feldman's treatment plan stated "see RX" but did not describe the specific type or dosage of any medications. Thereafter, on June 19, 2020, Expert dispensed and billed for Lidocaine 5% Patches and Naproxen pursuant to prescriptions allegedly issued by Dr. Moy dated June 15, 2020.

v.      Insured RB was allegedly involved in a motor vehicle accident on June 16, 2020. Thereafter, RB sought treatment with Rutland Medical at a No-Fault Clinic located at 951 Brook Avenue, Bronx, New York, and underwent an initial examination with NP Feldman on June 17, 2020. NP Feldman's treatment plan stated "oral analgesics and muscle relaxants" and "see RX" but did not describe the specific type or dosage of any medications. Thereafter, on June 24, 2020, Expert dispensed and billed for Lidocaine 5% Patches, Cyclobenzaprine, and Naproxen pursuant to prescriptions allegedly issued by Dr. Moy dated June 17, 2020.

76.     In further keeping with the fact that the Fraudulent Pharmaceuticals were not medically necessary and were prescribed and dispensed pursuant to fraudulent treatment protocols

and collusive agreements, at times two or more Insureds involved in the same minor motor vehicle accident received prescriptions for the same set of Fraudulent Pharmaceuticals at the time of their initial examinations with a Prescribing Provider.

77.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact will all affect whether, how, and to what extent an individual is injured in an automobile accident.

78.    It is extremely improbable – to the point of impossibility – that multiple Insureds involved in the same automobile accident who treated with the same Prescribing Provider would routinely require the same pharmaceutical products.

79.    Even so, and in keeping with the fact that the Fraudulent Pharmaceuticals were not medically necessary and were prescribed pursuant to predetermined protocols to maximize profits, at times two or more Insureds involved in the same minor motor vehicle accident received prescriptions for the same set of Fraudulent Pharmaceuticals at the time of their initial examinations with a Prescribing Provider. For example:

  i.    On July 14, 2020, two Insureds – JR and TD – were involved in the same automobile accident. Thereafter, JR and TD both received treatment with Jaga Medical, P.C. ("Jaga Medical") at a No-Fault Clinic located at 1900 B Ralph Avenue, Brooklyn, New York with Alicia Nicholls, P.A. ("PA Nicholls"). JR and TD were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations J.R. and T.D. were both issued prescriptions from PA Nicholls for Diclofenac Sodium Gel 3% and Meloxicam (an example of therapeutic duplication) which were dispensed and billed by Expert.

  ii.   On April 14, 2020, three Insureds – MC, HP, and NC – were involved in the same automobile accident. Thereafter, MC, HP, and NC all received treatment with Jaga Medical at a No-Fault Clinic located at 1900 B Ralph Avenue, Brooklyn, New York with PA Nicholls. MC, HP, and NC were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations MC, HP, and NC were all issued

prescriptions from PA Nicholls for Diclofenac Sodium Gel 3% and Meloxicam (another example of therapeutic duplication) which were dispensed and billed by Expert.

iii.  On July 5, 2020, three Insureds – FC, TM, and AN – were involved in the same automobile accident. Thereafter, FC, TM, and AN all received treatment with Jaga Medical at a No-Fault Clinic located at 107-04 Jamaica Avenue, Jamaica, New York with James Avellini, M.D. ("Dr. Avellini"). FC, TM, and AN were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations FC, TM, and AN were all issued prescriptions from Dr. Avellini for Diclofenac Sodium Gel 3% which was dispensed and billed by Expert. Additionally, FC and TM also received prescriptions for Meloxicam which were dispensed and billed by Expert.

iv.  On August 4, 2020, three Insureds – KT, PS, and SG – were involved in the same automobile accident. Thereafter, KT, PS, and SG all received treatment with BL Pain Management, PLLC ("BL Pain Management") at a No-Fault Clinic located at 787 Meacham Avenue, Elmont, New York with Boleslav Kosharskyy, M.D. ("Dr. Kosharskyy"). KT, PS, and SG were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations KT, PS, and SG were all issued prescriptions from Dr. Kosharskyy for Diclofenac Sodium Gel 3% which was dispensed and billed by Expert. Additionally, SG also received a prescription for Metaxalone which was dispensed and billed by Expert.

v.  On December 7, 2019, two Insureds – AA and AA – were involved in the same automobile accident. Thereafter, AA and AA both received treatment with BL Pain Management at a No-Fault Clinic located at 96-18 63rd Drive, Suite 302, Rego Park, New York with Dr. Kosharskyy. AA and AA were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations AA and AA were both issued prescriptions from Dr. Kosharskyy for Diclofenac Sodium Gel 3% which were dispensed and billed by Expert.

vi.  On September 18, 2020, two Insureds – MC and PC – were involved in the same automobile accident. Thereafter, MC and PC both received treatment with BL Pain Management at a No-Fault Clinic located at 18311 Hillside Avenue, Jamaica, New York with Dr. Kosharskyy. MC and PC were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations MC and PC were both issued prescriptions from Dr. Kosharskyy for Diclofenac Sodium Gel 3% and Baclofen which were dispensed and billed by Expert.

### i.  The Fraudulent Diclofenac Gel and Lidocaine Ointment Prescriptions

80.    In accordance with the fraudulent scheme discussed above, Expert primarily and routinely billed GEICO for exorbitantly priced Fraudulent Topical Pain Products primarily in the form of Diclofenac Sodium Gel 3% and Diclofenac Solution 1.5% (together, "Topical Diclofenac") and Lidocaine 5% Ointment, pursuant to duplicitous prescriptions solicited from Prescribing Providers and Clinic Controllers in exchange for kickbacks or other financial incentives.

81.    The Defendants solicited the Prescribing Providers and the Clinic Controllers to provide them with voluminous prescriptions for Topical Diclofenac because the Defendants could readily buy Topical Diclofenac at low cost but have Expert bill GEICO and other New York No-Fault insurers huge sums based on egregiously high wholesale prices.

82.    Topical Diclofenac is a topical nonsteroidal anti-inflammatory drug typically used to treat joint pain caused by osteoarthritis in the hands, wrists, elbows, knees, ankles, or feet.  It has not been approved for treating strains or sprains.

83.    The United States Food and Drug Administration ("FDA") requires that diclofenac sodium prescriptions contain a "Black Box Warning" indicating the potential for serious cardiovascular and gastrointestinal risks.

84.    A "Black Box Warning" is the strictest warning attached to the labeling of a prescription drug or product by the FDA and is designed to call attention to serious or life-threatening risks associated with the drug or product.

85.    Specifically, with every diclofenac sodium prescription, the FDA requires the patient be warned that: (i) diclofenac sodium may cause an increased risk of serious cardiovascular thrombotic events, myocardial infarction, and stroke, which can be fatal; and (ii) diclofenac

sodium may cause an increased risk of serious adverse gastrointestinal events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.

86.     While formulations containing 1% Diclofenac are typically used to treat joint pain caused by osteoarthritis in the hands, wrists, elbows, knees, ankles, or feet, they have not been proven effective for treating strains or sprains.

87.     Moreover, Diclofenac Sodium Gel 3%, which the Prescribing Providers prescribe, and the Pharmacy Defendants dispense and bill for, is only indicated for the treatment of actinic (or solar) keratosis – a skin condition caused by years of excessive sun exposure.

88.     Topical Diclofenac has no proven efficacy or safety in the treatment of musculoskeletal injuries, nor is the use of Topical Diclofenac to treat musculoskeletal injuries an accepted off-label use.

89.     Notwithstanding the most common uses for Topical Diclofenac, or the risks associated with the drug, the Defendants steered the Prescribing Providers to prescribe diclofenac sodium in the form of Topical Diclofenac, while they oftentimes recommended the patient continue the use of oral NSAIDs or simultaneously prescribed oral NSAIDs – such as celecoxib, meloxicam, or naproxen (or their name brand equivalents) – and other Fraudulent Pharmaceuticals including additional Fraudulent Topical Pain Products such as Lidocaine 5% Ointment.

90.     Prescribing Topical Diclofenac while simultaneously prescribing or recommending the patient take oral NSAIDs, constitutes therapeutic duplication.

91.     Therapeutic duplication is the prescribing and dispensing of two or more drugs from the same therapeutic class – such as oral and topical NSAIDs (e.g., naproxen and Diclofenac Sodium Gel 3%) – which puts the patient at greater risk of adverse drug reactions without providing any additional therapeutic benefit.

92.    Each year in the United States, approximately 4.5 million ambulatory care visits and 100,000 deaths occur as a result of adverse drug reactions.  A substantial number of these adverse drug reactions are the result of improper prescription practices associated with therapeutic duplication.  See, Mathew Witry, PharmD, PhD, Medication List Discrepancies and Therapeutic Duplications Among Dual Use Veterans, Federal Practitioner, 14 (September 2016).

93.    Nevertheless, Prescribing Providers consciously prescribed and the Defendants consciously dispensed Topical Diclofenac in conjunction with oral NSAIDs and/or Fraudulent Topical Pain Products to numerous Insureds, thereby engaging in therapeutic duplication, despite the risks it posed to the Insureds' health and well-being.

94.    In the instant matter, by engaging in such therapeutic duplication, the Prescribing Providers and the Defendants put patients at increased risk of serious cardiovascular and gastrointestinal events (without any additional therapeutic benefit) as the use of oral NSAIDs increases the "Black Box Warning" risks associated with diclofenac sodium.

95.    The Prescribing Providers engaged in therapeutic duplication by simultaneously prescribing oral NSAIDs and Topical Diclofenac, and at times also contemporaneously prescribed muscle relaxants, such as cyclobenzaprine and baclofen, and/or other Fraudulent Topical Pain Products.  For example:

     i.    Insured JS was allegedly involved in a motor vehicle accident on May 9, 2020. Thereafter, JS sought treatment with Jaga Medical at a No-Fault Clinic located at 1900 B Ralph Avenue, Brooklyn, New York, and underwent an initial examination with PA Nicholls on May 20, 2020. Despite the inherent risks of therapeutic duplication, PA Nicholls prescribed both a topical and an oral NSAID in the form of Diclofenac Sodium Gel 3% and Meloxicam which were dispensed and billed by Expert on May 20, 2020.

    ii.    Insured DS was allegedly involved in a motor vehicle accident on August 10, 2020. Thereafter, DS sought treatment with LR Medical, PLLC ("LR Medical") at a No-Fault Clinic located at 2277-83 Coney Island Avenue, Brooklyn, New York, and underwent an initial examination with Leonid Reyfman, M.D. ("Dr. Reyfman") on

September 9, 2020. Despite the inherent risks of therapeutic duplication, Dr. Reyfman prescribed both a topical and an oral NSAID in the form of Diclofenac Sodium Gel 3% and Naproxen which were dispensed and billed by Expert on September 13, 2020.

iii.   Insured SA was allegedly involved in a motor vehicle accident on July 19, 2020. Thereafter, SA sought treatment with Be Evergreen Medical, P.C. ("Be Evergreen Medical") at a No-Fault Clinic located at 107-15 Northern Boulevard, Corona, New York, and underwent an initial examination with Emerth Coburn, M.D. ("Dr. Coburn") on July 28, 2020. Dr. Coburn did not document he prescription of any medication under the treatment plan section of the examination report, thereby indicating no medication was recommended or prescribed. Nevertheless, on August 2, 2020, despite the inherent risks of therapeutic duplication, Expert dispensed and billed for both a topical and an oral NSAID in the form of Diclofenac Sodium Gel 3% and Naproxen pursuant to prescriptions allegedly written by Antohi Petronela, M.D. ("Dr. Petronela").

iv.   Insured MV was allegedly involved in a motor vehicle accident on January 22, 2020. Thereafter, MV sought treatment with Metro Point Medical, P.C. ("Metro Point Medical") at a No-Fault Clinic located at 90-46 Corona Avenue, Elmhurst, New York, and underwent a follow-up visit with Stephanie Bayner, M.D. ("Dr. Bayner") on June 4, 2020. Despite the inherent risks of therapeutic duplication, Dr. Bayner prescribed both a topical and an oral NSAID in the form of Diclofenac Sodium Gel 3% and Meloxicam which were dispensed and billed by Expert on June 28, 2020.

v.   Insured AS was allegedly involved in a motor vehicle accident on October 25, 2019. Thereafter, AS sought treatment with Jaga Medical at a No-Fault Clinic located at 1900 B. Ralph Avenue, Brooklyn, New York, and underwent an initial examination with PA Nicholls on November 13, 2019. Despite the inherent risks of therapeutic duplication, PA Nicholls prescribed both a topical and an oral NSAID in the form of Diclofenac Sodium Gel 3% and Meloxicam which were dispensed and billed by Expert on March 22, 2020.

vi.   Insured RC was allegedly involved in a motor vehicle accident on October 22, 2019. Thereafter, RC sought treatment with Jaga Medical at a No-Fault Clinic located at 107-04 Jamaica Avenue, Jamaica, New York, and underwent an initial examination with Dr. Avellini on October 31, 2019. Despite the inherent risks of therapeutic duplication, Dr. Avellini prescribed both a topical and an oral NSAID in the form of Diclofenac Sodium Gel 3% and Meloxicam which were dispensed and billed by Expert on March 19, 2020.

vii.   Insured CM was allegedly involved in a motor vehicle accident on December 28, 2019. Thereafter, CM sought treatment with Jaga Medical at a No-Fault Clinic located at 1900 B. Ralph Avenue, Brooklyn, New York, and underwent an initial examination with Dr. Avellini on January 6, 2020. Despite the inherent risks of

therapeutic duplication, Dr. Avellini prescribed both a topical and an oral NSAID in the form of Diclofenac Sodium Gel 3% and Meloxicam which were dispensed and billed by Expert on March 26, 2020.

viii.    Insured TT was allegedly involved in a motor vehicle accident on December 28, 2019. Thereafter, TT sought treatment with Jaga Medical at a No-Fault Clinic located at 1900 B. Ralph Avenue, Brooklyn, New York, and underwent an initial examination with Dr. Avellini on January 6, 2020. Despite the inherent risks of therapeutic duplication, Dr. Avellini prescribed both a topical and an oral NSAID in the form of Diclofenac Sodium Gel 3% and Meloxicam which were dispensed and billed by Expert on April 8, 2020.

ix.    Insured LM was allegedly involved in a motor vehicle accident on March 3, 2020. Thereafter, LM sought treatment with Be Evergreen Medical at a No-Fault Clinic located at 107-15 Northern Boulevard, Corona, New York, and underwent a follow-up examination with Dr. Coburn on April 27, 2020. Despite the inherent risks of therapeutic duplication, Dr. Coburn prescribed both a topical and an oral NSAID in the form of Diclofenac Sodium Gel 3% and Meloxicam which were dispensed and billed by Expert on April 30, 2020.

x.    Insured SA was allegedly involved in the same motor vehicle accident as LM, supra, on March 3, 2020. Thereafter, SA sought treatment with Be Evergreen Medical at a No-Fault Clinic located at 107-15 Northern Boulevard, Corona, New York, and underwent a follow-up examination with Dr. Coburn on July 2, 2020. Despite the inherent risks of therapeutic duplication, Dr. Coburn prescribed both a topical and an oral NSAID in the form of Diclofenac Sodium Gel 3% and Naproxen, as well as muscle relaxant Cyclobenzaprine, which were dispensed and billed by Expert on July 9, 2020.

96.    By prescribing and dispensing Topical Diclofenac in conjunction with oral NSAIDs, the Prescribing Providers and Expert engaged in therapeutic duplication and put patients at increased risk of serious cardiovascular and gastrointestinal events.

97.    The Topical Diclofenac was prescribed pursuant to collusive arrangements and predetermined treatment protocols, and without regard for patient care and safety, or the commercial availability of a wide range of FDA-approved medications, as well as over-the-counter medications proven to have therapeutic effects and available at a fraction of the cost.

98.    In keeping with the fact that Topical Diclofenac was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care and safety, the

initial examination reports prepared by the Prescribing Providers virtually never stated the medical basis for the prescriptions and, in some cases, failed to acknowledge that the patient was even being prescribed Topical Diclofenac.

99.     In further keeping with the fact that the Topical Diclofenac was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care, the follow-up examination reports performed by the Prescribing Providers virtually never addressed whether the Topical Diclofenac prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

100.    The Defendants almost exclusively dispensed and billed for Topical Diclofenac in the form of Diclofenac Sodium Gel 3% and Diclofenac Solution 1.5%.

101.    Defendants typically billed $944.00 for a single tube of Diclofenac Sodium Gel 3%, and to-date have billed GEICO more than $817,600.00 for this Fraudulent Topical Pain Product. Similarly, Defendants typically billed $1,168.50 for a single prescription of Diclofenac Solution 1.5%, and to-date have billed GEICO more than $392,200.00 for this Fraudulent Topical Pain Product.

102.    Not surprisingly, the Office of Inspector General of the U.S. Department of Health & Human Services recently issued a report which noted that one of the most common products billed for by pharmacies with questionable billing was diclofenac sodium because, among other reasons, there is a striking difference between the cost of a compounded topical containing diclofenac sodium and a non-compounded version of the same drug. In that same report, the OIG also noted that many pharmacies in New York State are among the most questionable in the nation.

See Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018).

103.    In addition to the egregious number of Topical Diclofenac prescriptions dispensed by the Defendants, the Defendants routinely billed GEICO for exorbitantly priced topical Lidocaine 5% Ointment, pursuant to duplicitous prescriptions solicited from the Prescribing Providers and Clinic Controllers in exchange for kickbacks or other incentives.

104.    Lidocaine 5% Ointment is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison oak, poison sumac abrasions of the skin and insect bites, or as a topical anesthetic for minor procedures such as sutures or injections.

105.    Lidocaine is a local anesthetic (numbing medication) that works by blocking nerve signals in the top few millimeters of skin.  Lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain.

106.    Excessive dosage or short intervals between doses of Lidocaine 5% Ointment can cause serious adverse effects including, among others, bradycardia, hypotension, and cardiovascular collapse that may lead to cardiac arrest. Accordingly, patients should be instructed to strictly adhere to the recommended dosage and a single application of Lidocaine 5% Ointment should not exceed 5 grams.

107.    Despite this, the Prescribing Providers never recommended Insureds first use over-the-counter lidocaine ointments or lotions to treat their minor aches and pains which they sustained in fender-bender type motor vehicle accidents. Rather, pursuant to collusive arrangements and predetermined protocols, the Prescribing Providers and Clinic Controllers routinely prescribed to

Insureds, or caused the prescription of, Lidocaine 5% Ointment and directed the prescriptions to Expert.

108.    Further, to the extent that topical lidocaine ointment is effective for treating certain specific conditions, the Lidocaine 5% Ointment dispensed by the Defendants is only marginally stronger or more effective than OTC 4% lidocaine yet costs exponentially more. Rather than provide more conservative, cost-effective treatment, the Prescribing Providers, pursuant to their collusive agreements with the Defendants and in order to exploit the Insureds for financial gain, virtually never directed the Insureds to try OTC 4% lidocaine prior to prescribing the Lidocaine 5% Ointment.

109.    For example, the Prescribing Providers never recommended insureds first try Icy Hot Lidocaine (which contains 4% lidocaine) or other similar OTC lidocaine products available at most well-known pharmacy retailers at a mere fraction of the cost.

110.    In keeping with the fact that the Defendants submitted bills pursuant to collusive arrangements with the Prescribing Providers and Clinic Controllers and pursuant to fraudulent, predetermined and profit-driven treatment protocols, the Lidocaine 5% Ointment prescriptions were often issued contemporaneous to oral NSAIDs, muscle relaxers and/or other Fraudulent Topical Pain Products such as Topical Diclofenac.  For example:

     i.    Insured SO was allegedly involved in a motor vehicle accident on June 17, 2020. Thereafter, SO sought treatment with Rutland Medical at a No-Fault Clinic located at 135-25 79th Street, Howard Beach, Brooklyn, New York, and underwent an initial examination with NP Feldman on June 18, 2020. NP Feldman prescribed Lidocaine 5% Patches, Naproxen, Cyclobenzaprine, and Diclofenac Sodium Gel 3% which were dispensed and billed by Expert on June 25, 2020.

    ii.    Insured ML was allegedly involved in a motor vehicle accident on January 31, 2020. Thereafter, ML sought treatment with Rutland Medical at a No-Fault Clinic located at 145 East 98th Street, Brooklyn, New York, and underwent an examination with NP Feldman on June 18, 2020. NP Feldman prescribed Lidocaine 5%

Ointment, Naproxen, and Cyclobenzaprine which were dispensed and billed by Expert on June 25, 2020.

iii.  Insured OL was allegedly involved in a motor vehicle accident on January 31, 2020. Thereafter, OL sought treatment with Rutland Medical at a No-Fault Clinic located at 145 East 98th Street, Brooklyn, New York, and underwent an examination with NP Feldman on June 18, 2020. NP Feldman prescribed Lidocaine 5% Ointment, Naproxen, and Cyclobenzaprine which were dispensed and billed by Expert on June 25, 2020.

iv.  Insured LS was allegedly involved in a motor vehicle accident on December 4, 2019. Thereafter, LS sought treatment with Rutland Medical at a No-Fault Clinic located at 135-25 79th Street, Howard Beach, New York, and underwent an examination with NP Feldman on July 6, 2020. NP Feldman prescribed Lidocaine 5% Ointment, Meloxicam, and Cyclobenzaprine which were dispensed and billed by Expert on July 7, 2020.

v.  Insured LH was allegedly involved in a motor vehicle accident on June 5, 2020. Thereafter, LH sought treatment with Rutland Medical at a No-Fault Clinic located at 71 South Central Avenue, Valley Stream, Brooklyn, New York, and underwent an initial examination with NP Feldman on June 9, 2020. NP Feldman prescribed Lidocaine 5% Ointment and Diclofenac Sodium Gel 3% which were dispensed and billed by Expert on June 12, 2020. Although these pharmaceuticals are not within the same drug class, both Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment have associated potential cardiovascular risks.

vi.  Insured NR was allegedly involved in a motor vehicle accident on October 28, 2019. Thereafter, NR sought treatment with Rutland Medical at a No-Fault Clinic located at 71 South Central Avenue, Valley Stream, New York, and underwent an examination with NP Feldman on June 16, 2020. NP Feldman prescribed Lidocaine 5% Ointment and Diclofenac Sodium Gel 3% which were dispensed and billed by Expert on June 23, 2020. Although these pharmaceuticals are not within the same drug class, both Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment have associated potential cardiovascular risks.

vii.  Insured SC was allegedly involved in a motor vehicle accident on July 19, 2020. Thereafter, SC sought treatment with Be Evergreen Medical at a No-Fault Clinic located at 107-15 Northern Boulevard, Corona, New York, and underwent an examination with Dr. Coburn on July 28, 2020. Dr. Coburn prescribed Lidocaine 5% Ointment, Naproxen, and Cyclobenzaprine which were dispensed and billed by Expert on August 2, 2020.

viii.  Insured DB was allegedly involved in a motor vehicle accident on January 17, 2020. Thereafter, DB sought treatment with Rutland Medical at a No-Fault Clinic located at 145 East 98th Street, Brooklyn, New York, and underwent a follow-up examination with NP Feldman on July 9, 2020. NP Feldman prescribed Lidocaine

5% Ointment and Diclofenac Sodium Gel 3% which were dispensed and billed by Expert on July 21, 2020. Although these pharmaceuticals are not within the same drug class, both Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment have associated potential cardiovascular risks.

ix. Insured LV was allegedly involved in a motor vehicle accident on February 21, 2020. Thereafter, LV sought treatment with Be Evergreen Medical at a No-Fault Clinic located at 107-15 Northern Boulevard, Corona, New York, and underwent an examination with Dr. Coburn on March 4, 2020. Dr. Coburn prescribed Lidocaine 5% Ointment, Naproxen, Amitriptyline, and Cyclobenzaprine which were dispensed and billed by Expert on May 6, 2020.

x. Insured JM was allegedly involved in a motor vehicle accident on April 3, 2019. Thereafter, JM sought treatment with Inwood Medical Care, PLLC ("Inwood Medical") at a No-Fault Clinic located at 64 Nagle Avenue, New York, New York, and underwent an examination with Dr. Abraham on August 19, 2019. Dr. Abraham prescribed Lidocaine 5% Ointment, Naproxen, Amitriptyline, and Cyclobenzaprine which were dispensed and billed by Expert on May 28, 2020.

111. As with the prescriptions for Topical Diclofenac, the initial examination reports prepared by the Prescribing Providers virtually never set forth the medical basis for the Lidocaine 5% Ointment prescriptions and, in some cases, failed to acknowledge that the patient was even being prescribed a Lidocaine 5% Ointment. Likewise, the follow-up examination reports virtually never addressed whether the Lidocaine 5% Ointment prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

112. Expert typically billed between $609.00 and $1,480.00 for a single tube of Lidocaine 5% Ointment and, to-date, has submitted over $257,400.00 in claims to GEICO seeking reimbursement of Lidocaine 5% Ointment.

113. The Defendants' egregious billing coupled with the fact that the Prescribing Providers failed to properly document – or even document at all – the prescriptions for Topical Diclofenac and Lidocaine 5% Ointment, or the Insureds' use of these medications, further indicates that there was no legitimate medical reason for the Prescribing Providers to have prescribed large

volumes of these medications to the Insureds, or for Expert to have dispensed such large volumes to the Insureds, particularly given the potential for adverse health effects.

114.    Moreover, the Prescribing Providers at times prescribed and the Defendants dispensed the Topical Pain Products contemporaneous to muscle relaxants such as Cyclobenzaprine.

115.    In accordance with best practices, a prescription for a seven-to-ten-day supply of Cyclobenzaprine may be appropriate during the *acute* stages of injury. However, the Prescribing Providers often prescribed, and the Defendants dispensed, thirty-day supplies of Cyclobenzaprine and at times such prescriptions were issued well past the acute stages of injury. For example:

    i.    Insured PJ was allegedly involved in a motor vehicle accident on November 13, 2018. Thereafter, PJ sought treatment with SMB Medical, P.C. ("SMB Medical") at a No-Fault Clinic located at 59-07 94th Street, Elmhurst, New York. She underwent an examination with Dr. Bayner on April 7, 2020 where Dr. Bayner issued prescriptions for Diclofenac Sodium Gel 3%, Butalbital, and a thirty-day supply of Cyclobenzaprine more than one year post-accident. On April 8, 2020, Expert dispensed for Diclofenac Sodium Gel 3%, Butalbital and Cyclobenzaprine to this Insured pursuant to the prescriptions from Dr. Bayner dated April 7, 2020.

    ii.    Insured RD was allegedly involved in a motor vehicle accident on October 11, 2019. Thereafter, RD sought treatment with BL Pain Management at a No-Fault Clinic located at 183-11 Hillside Avenue, Jamaica, New York. RD underwent an examination with Dr. Kosharskyy on July 20, 2020 where Dr. Kosharskyy issued prescriptions for Diclofenac Sodium Gel 3% and a thirty-day prescription for Cyclobenzaprine nearly nine months post-accident. On July 23, 2020, Expert dispensed for Diclofenac Sodium Gel 3% and Cyclobenzaprine to this Insured pursuant to the prescriptions from Dr. Kosharskyy dated July 20, 2020.

    iii.    Insured EM was allegedly involved in a motor vehicle accident on October 31, 2019. Thereafter, EM sought treatment with Rutland Medical at a No-Fault Clinic located at 135-25 79th Street, Suite 2A, Howard Beach, New York. She underwent a follow-up examination with PA Aldad on March 17, 2020 where PA Aldad issued prescriptions for a Lidocaine 5% patch and a thirty-day prescription for Cyclobenzaprine nearly six months post-accident. On March 22, 2020, Expert dispensed for a Lidocaine 5% patch and Cyclobenzaprine to this Insured pursuant to the prescriptions from PA Aldad dated March 17, 2020.

iv.  Insured OL was allegedly involved in a motor vehicle accident on January 31, 2020. Thereafter, OL sought treatment with Rutland Medical at a No-Fault Clinic located at 145 East 98th Street, Brooklyn, New York. OL underwent a re-evaluation with NP Feldman on June 18, 2020 where NP Feldman issued prescriptions for Lidocaine 5% Ointment, Naproxen, and a thirty-day prescription for Cyclobenzaprine nearly six months post-accident. On June 25, 2020, Expert dispensed for Lidocaine 5% Ointment, Naproxen, and Cyclobenzaprine to this Insured pursuant to the prescriptions from NP Feldman dated June 18, 2020.

v.  Insured ML was allegedly involved in a motor vehicle accident on January 31, 2020. Thereafter, ML sought treatment with Rutland Medical at a No-Fault Clinic located at 145 East 98th Street, Brooklyn, New York. ML underwent a re-evaluation with NP Feldman on June 18, 2020 where NP Feldman issued prescriptions for Lidocaine 5% Ointment, Naproxen, and a thirty-day prescription for Cyclobenzaprine nearly six months post-accident. On June 25, 2020, Expert dispensed for Lidocaine 5% Ointment, Naproxen, and Cyclobenzaprine to this Insured pursuant to the prescriptions from NP Feldman dated June 18, 2020.

vi.  Insured KL was allegedly involved in a motor vehicle accident on January 12, 2019. Thereafter, KL sought treatment with LR Medical at a No-Fault Clinic located at 2277-83 Coney Island Avenue, Brooklyn, New York. She underwent a virtual examination with Dr. Reyfman on April 2, 2020 where Dr. Reyfman issued prescriptions for Acetaminophen, and a thirty-day prescription for Cyclobenzaprine nearly four months post-accident. Three weeks later, on April 23, 2020, Expert dispensed for Acetaminophen and Cyclobenzaprine to this Insured pursuant to the prescriptions from Dr. Reyfman dated April 2, 2020.

vii.  Insured JO was allegedly involved in a motor vehicle accident on October 23, 2019. Thereafter, JO sought treatment with Be Evergreen Medical at a No-Fault Clinic located at 107-15 Northern Boulevard, Corona, New York. He underwent a follow-up examination with Dr. Coburn on February 12, 2020 where Dr. Coburn issued prescriptions for Meloxicam and a thirty-day prescription for Cyclobenzaprine nearly three months post-accident. *Nearly six weeks later*, on March 25, 2020, Expert dispensed for Meloxicam and Cyclobenzaprine to this Insured pursuant to the prescriptions from Dr. Coburn dated February 12, 2020.

viii.  Insured RH was allegedly involved in a motor vehicle accident on November 9, 2019. Thereafter, RH sought treatment with Be Evergreen Medical at a No-Fault Clinic located at 107-15 Northern Boulevard, Corona, New York. He underwent a follow-up examination with Dr. Coburn on February 24, 2020 where Dr. Coburn issued prescriptions for Methylprednisolone, Amitriptyline, and a thirty-day prescription for Cyclobenzaprine nearly three months post-

accident. Nearly one month later, on March 19, 2020, Expert dispensed for Methylprednisolone, Amitriptyline, and Cyclobenzaprine to this Insured pursuant to the prescriptions from Dr. Coburn dated February 24, 2020.

ix.     Insured LM was allegedly involved in a motor vehicle accident on March 3, 2020. Thereafter, LM sought treatment with Be Evergreen Medical at a No-Fault Clinic located at 107-15 Northern Boulevard, Corona, New York. LM underwent a follow-up examination with Dr. Coburn on July 28, 2020 where Dr. Coburn issued prescriptions for Diclofenac Sodium Gel 3%, Amitriptyline, and a thirty-day prescription for Cyclobenzaprine nearly five months post-accident. On August 4, 2020, Expert dispensed for Diclofenac Sodium Gel 3%, Amitriptyline and Cyclobenzaprine to this Insured pursuant to the prescriptions from Coburn dated July 28, 2020.

### ii.   The Fraudulent Pain Patch Prescriptions

116.     As a further part of the scheme, Expert routinely billed GEICO for exorbitantly priced pain patches – primarily in the form of Lidothol 4.5-5% Patches ("Lidothol Patches") and Lidocaine 5% Patches ("Lidocaine Patches") (collectively, the "Topical Pain Patches"), pursuant to prescriptions solicited from the Prescribing Providers and the Clinic Controllers in exchange for kickbacks or other incentives.

117.     In keeping with the fact that the Defendants steered the Prescribing Providers to prescribe the Fraudulent Pharmaceuticals pursuant to predetermined protocols designed to maximize profits without regard for patient care, the Topical Pain Patches were routinely dispensed and billed at exorbitant prices despite the availability of less expensive, commercially available FDA-approved patches.

118.     Despite the fact that the Prescribing Providers regularly prescribe Lidothol Patches, and the Defendants regularly dispense same, Lidothol Patches are not FDA-approved.

119.     Further, Lidocaine Patches are primarily used to treat chronic post-herpetic neuropathic pain, although studies have shown that any relief these patches provide – beyond topical anesthetic relief – is more attributable to its placebo effect rather than the pharmacological

action of the Lidocaine Patches themselves. In fact, while the application of pain patches in which the primary ingredient is Lidocaine provides sufficient absorption to cause an anesthetic effect, it is insufficient to produce a complete sensory block.

120.    Nevertheless, the Prescribing Providers routinely prescribed these patches to Insureds for sprain/strain injuries sustained in fender-bender type motor vehicle accidents.

121.    Like the prescriptions for Lidocaine 5% Ointment, the Prescribing Providers virtually never recommended Insureds first use over-the-counter products – which are available to treat their often acute, minor strain/sprain injuries. Rather, pursuant to collusive arrangements and predetermined protocols, the Prescribing Providers routinely prescribed Insureds Topical Pain Patches.

122.    As with the prescriptions for the other Fraudulent Topical Pain Products, the initial examination reports prepared by the Prescribing Providers virtually never set forth the medical basis for the prescriptions for the Topical Pain Patches. Likewise, the follow-up examination reports virtually never addressed whether the Topical Pain Patches prescribed provided any pain relief to the patient or were otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

123.    In keeping with the fact that the Defendants acted with gross indifference to patient care and safety, upon information and belief the patients were generally not instructed on the safe use, side effects or risks associated with the Topical Pain Patches.  Moreover, despite these risks, as demonstrated in the claims examples throughout this Complaint, the Prescribing Providers regularly prescribed, and the Pharmacy Defendants regularly dispensed, Topical Pain Patches contemporaneously to other Fraudulent Pharmaceuticals.

124.    Defendants typically billed $246.60 to $739.80 for a prescription of Lidocaine Patches and to-date have billed GEICO more than $110,900.00 for this Fraudulent Topical Pain Product. Similarly, Defendants typically billed $1,267.20 to $1,311.30 for a single prescription of Lidothol Patches, and to-date have billed GEICO more than $81,700.00 for this Fraudulent Topical Pain Product.

C.    **The Exploiting of Patients for Financial Gain Through the Illegal, Collusive Arrangements Among Expert, the Prescribing Providers and the Clinic Controllers**

125.    To effectuate the fraudulent scheme, the Defendants steered the Prescribing Providers and Clinic Controllers to routinely prescribe and direct prescriptions to Expert for large volumes of the Fraudulent Topical Pain Products pursuant to their collusive arrangements, which egregiously inflated the charges submitted to GEICO.

126.    New York's statutory framework provides, among other things, that pharmacies and licensed medical professionals are prohibited from (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain, and (ii) "directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

127.    New York's statutory framework also specifically prohibits collusive arrangements between licensed physicians and pharmacies involving compounded or specially marked prescriptions. See N.Y. Education Law § 6530(38) and § 6811(7). In fact, New York Education Law § 6811(7) makes such agreements criminal.

128.    Here, the Defendants colluded with the Prescribing Providers and Clinic Controllers associated with various No-Fault Clinics, which treat thousands of Insureds, to have the Prescribing Providers, prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals,

including the Fraudulent Topical Pain Products, and then to have those prescriptions directed to Expert so that the Defendants could bill GEICO huge sums.

129.   In furtherance of the scheme, the Prescribing Providers intentionally prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics pursuant to the collusive arrangements and fraudulent predetermined protocols, and without regard to genuine patient care, without regard to cost and attention to fiscal responsibility, and often without regard to pharmacologic outcomes.

130.   The Prescribing Providers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics, while the Defendants dispensed, or purported to dispense the Fraudulent Pharmaceuticals, despite their knowledge that they were involved in illegal, collusive arrangements designed to exploit the patients for financial gain; the Fraudulent Pharmaceuticals were often prescribed and dispensed without regard to pharmacologic outcomes; the Fraudulent Pharmaceuticals were prescribed and dispensed with gross indifference to patient health, care and safety; the Fraudulent Topical Pain Products were prescribed and dispensed as a matter of course without any recommendation that patients first try over-the-counter products; and that the Fraudulent Topical Pain Products were prescribed and dispensed without any attention to cost and fiscal responsibility, given that there are FDA-approved drugs available and appropriate for the particular patients at significantly less cost.

131.   The Defendants, in collusion with the Prescribing Providers and Clinic Controllers, made sure that the Insureds never had the option to use a pharmacy of their choosing, and instead ensured that the prescriptions for the Fraudulent Pharmaceuticals were directed to Expert, notwithstanding that (i) in many instances the No-Fault Clinics and the patients themselves were

located in counties far from Expert, and (ii) there were countless other pharmacies located much closer to the No-Fault Clinics and the patients.

132.     In many cases, Expert purported to mail or deliver the Fraudulent Pharmaceuticals directly to the Insureds' homes without the patient even knowing that they were to receive a Fraudulent Pharmaceutical.

133.     Alternatively, the Insureds were given the Fraudulent Pharmaceuticals dispensed by Expert directly from the front desk staff at the various No-Fault Clinics, again without ever even knowing that they were to receive a Fraudulent Pharmaceutical.

134.     The Defendants, the Prescribing Providers and the Clinic Controllers did not give the Insureds the option to identify a pharmacy of their choosing to ensure that the prescriptions were filled by Expert, and to ensure that the Defendants benefitted financially from the prescriptions.

135.     The Prescribing Providers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients.

136.     The Prescribing Providers and the Clinic Controllers had no legitimate reason to direct the prescriptions for the Fraudulent Pharmaceuticals to Expert rather than to a multitude of other pharmacies that were equally capable of dispensing the prescriptions and often more convenient to many of the patients.

137.     The Defendants, the Prescribing Providers and the Clinic Controllers would not have engaged in the illegal, collusive arrangements in violation of New York law, including intentionally prescribing the Fraudulent Pharmaceuticals and directing those prescriptions to Expert, unless they profited from their participation in the illegal scheme.

138.    But for the payments of kickbacks or other financial incentives from the Defendants, the Prescribing Providers would not have prescribed the Fraudulent Topical Pain Products, or the volume of other Fraudulent Pharmaceuticals, and the Prescribing Providers and Clinic Controllers would not have directed the prescriptions to Expert.

139.    The Defendants, Prescribing Providers, and Clinic Controllers affirmatively concealed the particular amounts paid for the kickbacks since such kickbacks are in violation of New York law.

140.    Nevertheless, based on the circumstances surrounding the illegal, collusive, arrangements, the Defendants paid a financial kickback or provided other financial incentives, and the Prescribing Providers and Clinic Controllers received a financial kickback or other financial incentives, for each of the prescriptions for the Fraudulent Pharmaceuticals that were dispensed by Expert.

141.    Upon information and belief, the payment of kickbacks by the Defendants was made at or near the time the prescriptions were issued.

**D.      The Fraudulent Billing the Defendants Submitted or Cause to be Submitted to GEICO**

142.    Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged.  Each NDC number has an assigned Average Wholesale Price ("AWP").

143.    Each NDC (and, thus, the AWP) for a particular prescription product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained.  The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

144.    Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee schedule"), for each brand name drug (or ingredient included in a compounded product) a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

145.    For each generic drug (or ingredient included in a compounded product) the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

146.    The Defendants solicited the Clinic Controllers and the Prescribing Providers to provide them with voluminous prescriptions for the Fraudulent Topical Pain Products because the Defendants could readily buy the Fraudulent Topical Pain Products at low cost but bill GEICO and other New York No-Fault insurers inflated amounts based on egregiously high wholesale prices.

147.    The Defendants intentionally targeted the Fraudulent Topical Pain Products, with extremely expensive "average wholesale prices," in order to inflate Expert's billing and maximize their profits.

148.    In support of their charges, the Defendants typically submitted: (i) the Prescribing Providers' prescription; (ii) a "No-Fault" form, known as an NF-3 Form, which included the purported NDC numbers, units, and corresponding charges for each drug product or ingredient; (iii) a delivery slip; and (iv) the executed assignment of benefits form ("AOB") assigning the Insureds' benefits to the Defendants.

149.    The NDC numbers listed on the NF-3 Forms submitted by the Defendants are what identified the purported AWPs for each of the Fraudulent Pharmaceuticals.

150.    The Defendants never submitted to GEICO their wholesale purchase invoices demonstrating how much Expert actually paid the supplier for the Fraudulent Topical Pain Products.

151.    The Defendants never submitted to GEICO any documents evidencing whether Expert actually purchased topical pain products with the particular NDC number used in the billing, representing purchases from a particular supplier in a particular quantity.

152.    In fact, Expert never actually paid the targeted and egregious "average wholesale price" of the Fraudulent Topical Pain Products that it dispensed, or purported to dispense, because it is not a true representation of actual market price and is far above the actual acquisition cost for Fraudulent Topical Pain Products.

153.    Expert paid only a fraction of the "average wholesale price" of the Fraudulent Topical Pain Products that the Defendants targeted to use in connection with Expert's billing, but nevertheless billed GEICO and other No-Fault automobile insurers egregious amounts far surpassing the cost of an array of other FDA approved, proven effective medications or commercially available over-the-counter products.

154.    Further, upon information and belief, Expert often did not actually purchase topical pain products with the particular NDC number used in the billing, and instead purchased topical pain products from different suppliers and/or in different quantities but nonetheless used the NDC number in their billing that generated the highest reimbursement amount in order to inflate the Defendants' profits.

## IV.    The Defendants' Submission of Fraudulent NF-3 Forms to GEICO

155.    To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits consistently have been submitted to GEICO by and on behalf of Expert seeking payment for pharmaceuticals for which Expert is ineligible to receive.

156.    These forms, including NF-3 forms, HCFA-1500 forms and other supporting records that the Defendants submit or cause to be submitted to GEICO, are false and misleading in the following material respects:

    i.    The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care. In fact, the Fraudulent Pharmaceuticals were not medically necessary and were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain without regard for genuine patient care;

    ii.    The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that the Defendants engaged in illegal, collusive relationships with the Prescribing Providers and Clinic Controllers in order to steer voluminous and illegal prescriptions to Expert for the Fraudulent Pharmaceuticals, in exchange for the payment of kickbacks and other financial incentives;

    iii.    The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Defendants did not comply with all material licensing requirements in that they dispensed the Fraudulent Pharmaceuticals pursuant to illegal, invalid, and duplicitous prescriptions; and

    iv.    The NF-3 forms, HCFA-1500 forms and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Defendants did not comply with all material

licensing requirements in that the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals.

## V.     The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

157.     The Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to the Insureds and the billing they submit or cause to be submitted to GEICO seeking reimbursement for these products.

158.     To induce GEICO to promptly pay the charges for the Fraudulent Pharmaceuticals, the Defendants have gone to great lengths to systematically conceal their fraud.

159.     Specifically, the Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; and (ii) the Defendants were involved in collusive kickback arrangements with the Prescribing Providers and Clinic Controllers designed to generate voluminous prescriptions solely to maximize the billing submitted to GEICO and other New York insurance companies.

160.     The Defendants also billed for the Fraudulent Pharmaceuticals based on purported prescriptions from multiple Prescribing Providers operating from multiple No-Fault Clinics in order to reduce the amount of billing based on any single licensee.

161.     The Defendants also falsely presented Expert as a legitimate neighborhood pharmacy, but in reality it is nothing more than a "morph" of DNA Pharmacy and an extension of the fraudulent scheme described in the DNA litigation.

162.     The billing and supporting documentation submitted by the Defendants for the Fraudulent Pharmaceuticals, when viewed in isolation, did not reveal its fraudulent nature.

163.    The Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.  In fact, Expert continues to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that Expert has been engaged in fraud.

164.    In fact, the Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that Expert has ceased active operations, and has been engaged in fraud.

165.    The Defendants' collection efforts through numerous separate no-fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme since they know it is impractical for an arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale, complex fraud scheme involving the prescription and dispensing of fraudulent pharmaceuticals to patients by numerous prescribers across numerous different clinics.

166.    GEICO takes steps to timely respond to all claims and to ensure that No-fault claim denial forms or requests for additional verification of No-fault claims are properly addressed and mailed in a timely manner.  GEICO is also under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially-valid documents that were submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of approximately $804,600.00 representing payments made by GEICO based upon the fraudulent charges submitted by the Defendants.

167.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**THE FIRST CLAIM FOR RELIEF**
**Against All Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

168.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

169.    There is an actual case in controversy between GEICO and the Defendants regarding approximately $981,800.00 in fraudulent billing for the Fraudulent Pharmaceuticals that the Defendants submitted or caused to be submitted to GEICO through Expert.

170.    Expert has no right to receive payment for any pending bills submitted to GEICO because Expert billed for pharmaceutical products that were medical unnecessary, and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care.

171.    Expert has no right to receive payment for any pending bills submitted to GEICO because the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Expert in exchange for unlawful kickbacks and other financial incentives.

172.    Expert has no right to receive payment for any pending bills submitted to GEICO because the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and had Expert dispense in large

volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

173.    Expert has no right to receive payment for any pending bills submitted to GEICO because the Defendants submitted or caused to be submitted charges for the Fraudulent Pharmaceuticals dispensed by Expert pursuant to illegal, invalid, and duplicitous prescriptions.

174.    The Defendants, including Expert, violated New York State regulatory and licensing requirements, rendering the pharmacy ineligible to receive reimbursement for No-Fault Benefits.

175.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Expert has no right to receive payment for any pending bills submitted to GEICO.

### THE SECOND CLAIM FOR RELIEF
**Against Shalomov**
**Violation of RICO, 18 U.S.C. § 1962(c))**

176.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

177.    Expert is an ongoing "enterprise", as that term is defined in 18 U.S.C § 1961(4), that engages in activities which affect interstate commerce.

178.    Shalomov knowingly has conducted and/or participated, directly or indirectly, in the conduct of Expert's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of United States mail to submit or cause to be submitted thousands of fraudulent charges seeking payments that Expert was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary and/or the product of predetermined fraudulent protocols designed to

exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Expert in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceuticals that they dispensed in large volumes to Insureds with exorbitant charges, in place, of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) the billed-for services were the product of illegal, invalid, and duplicitous prescriptions. A sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

179.    Expert's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Shalomov operated Expert, inasmuch as Expert was never eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Expert to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants actively continue to attempt collection on the fraudulent billing submitted through Expert to the present day.

180.    Expert is inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants.

These inherently unlawful acts are taken by Expert in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

181.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $804,600.00 pursuant to the fraudulent bills submitted by the Defendants.

182.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fee pursuant to 18 U.S.C. § 1961(4), any other relief the Court deems just and proper.

**THE THIRD CLAIM FOR RELIEF**
**Against All Defendants**
**(Common Law Fraud)**

183.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

184.    The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of Expert.

185.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary and properly billed when in fact the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that Expert was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants participated in illegal, collusive

relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Expert in exchange for unlawful kickbacks and other financial incentives; (iii) in every claim, the representation that Expert was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the billed-for services were the product of illegal, invalid, duplicitous, and altered prescriptions; and (iv) in every claim, the representation that Expert was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds with inflated charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

186.    The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Expert that were not compensable under the No-Fault Laws.

187.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $804,600.00 pursuant to the fraudulent bills submitted, or caused to be submitted, by the Defendants through Expert.

188.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

189.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THE FOURTH CLAIM FOR RELIEF
### Against All Defendants
### (Unjust Enrichment)

190.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

191.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

192.    When GEICO paid the bills and charges submitted by or on behalf of Expert for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

193.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

194.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

195.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $804,600.00.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.    On the First Claim for Relief against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Expert has no right to receive

payment for any pending bills, amounting to approximately $981,800.00 in charges submitted to GEICO;

        B.      On the Second Claim For Relief against Shalomov, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $804,600.00, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

        C.      On the Third Claim for Relief against Shalomov, a recovery in favor of GEICO in an amount to be determined at trial but approximately $804,600.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

        D.      On the Fourth Claim for Relief against all the Defendants, a recovery in favor of GEICO in an amount to be determined at trial but approximately $804,600.00, together with punitive damages.

Dated: Uniondale, New York
        June 22, 2022

                RIVKIN RADLER LLP

                By:   /s/ *Michael A. Sirignano, Esq.*
                    Michael A. Sirignano
                    Barry I. Levy
                    Priscilla D. Kam
                    Vincent J. Pontrello
                926 RXR Plaza
                Uniondale, New York 11556
                (516) 357-3000

                *Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*